# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | No. 05 CR 689 |
| | ) | Judge Blanche M. Manning |
| BERNARD BAGGETT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Bernard Baggett faces one count of being a convicted felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). He has moved for suppression of the firearm he allegedly possessed, contending that police recovered it during an illegal search of his home. The court held a hearing on Baggett's motion, during which the parties presented testimony from two police officers who arrested Baggett, as well as from Baggett's daughter. After reviewing the parties' briefs and hearing from their witnesses, and for the reasons that follow, Baggett's motion to suppress is GRANTED.

### Background

The parties tell markedly different stories about the events that led up to Baggett's arrest. Because of the sharp contrast between the stories, resolution of Baggett's motion to suppress turns entirely on the testimony and credibility of the parties' witnesses. Therefore, the court will recount in detail the testimony offered during Baggett's suppression hearing.

*Testimony Of Police Officers*

The government offered testimony from the two officers who arrested Baggett, Kristopher Rigan and Richard Losik. According to Rigan and Losik, on the evening of April 9, 2005, they received word of a 911 call reporting shots fired and a baby crying inside a home on

the block where Baggett lived.  At the time, Rigan and Losik were in a patrol car just a couple of blocks away and were the first to respond to the call.  When they arrived they found Baggett on his front porch holding a baby.  As they approached, Rigan asked Baggett if he could put the baby down so that officers could talk to him.  In response, Baggett turned around either to place the baby down or to take the child inside.  As he turned, a revolver fell from his waist through his pant leg and onto the ground.  Police recovered the gun and arrested Baggett.

*Testimony of Baggett's Daughter*

The defense offered the testimony of Baggett's 14-year-old daughter, Faye Simms.  She testified that she was in the kitchen washing dishes when she heard her father call to her from the front porch, where he had gone with his infant son to see if Simms' mother had arrived home.  When Simms got to the front porch, Baggett handed her the baby and officers told Baggett and Simms to remain on the porch, which they did for about 20 minutes.  Meanwhile, police searched inside the family's home without consent.  When the officers eventually emerged, they were holding a gun, told Baggett they were going to claim that it was his, and arrested him.  Baggett told a similar story in an affidavit attached to and in support of his motion to suppress.

**Analysis**

Baggett argues that the gun should be suppressed because police searched his home without consent.  The government, on the other hand, argues that no search occurred because police saw the gun in plain view after it fell from Baggett's pants.  The court must therefore determine whose testimony was the most credible.

The court had the opportunity to observe the demeanor of Baggett's daughter, Simms, during her testimony.  She sounded and appeared to be sincere.  It has not escaped the court's

notice that Simms is apparently a devoted daughter and might have an incentive to recall events in a way that would not implicate her father. But even with that in mind, the court finds that her testimony was credible. Her story was consistent to the one told by Baggett in his affidavit. Although the allegations she made about the officers barging into her home without her father's consent were disturbing, such illegal searches unfortunately occur and so her story is not implausible.

During closing arguments, the prosecutor argued that Sims' story made no sense because the officers would never have admitted planting a gun on Baggett, and would not have needed to enter Baggett's home to do so. But Sims never testified that the officers planted the gun, and never denied that the gun was in the house. She testified only that police found the gun only after entering the home without consent. Although Sims testified that the officers told Baggett that they were going to say the gun was his, the officers' alleged statement is a far cry from admitting that they had planted the gun on Baggett.

The prosecutor also argued that Sims' story made no sense because, according to her testimony, the officers left her and Baggett—the suspected shooter—alone on their front porch for 20 minutes. But, according to Sims, other officers had responded to the call of shots fired and were still on the scene. Rigan and Losik confirmed that other officers had arrived on the scene. In light of the presence of the other officers, Sims' testimony that Rigan and Losik left her and her father on the porch is not implausible.

On the whole, the court finds that Sims' testimony and her description of events was reasonable. Furthermore, based upon the court's observation of her demeanor, she appeared

credible and sincere. Accordingly the court credits her testimony and affords it significant weight.

In contrast, based upon its careful study of the demeanor of the officers who testified for the government, the court finds that they appeared less sincere than Sims, and their testimony was less credible. Most striking is the inconsistency in the officers' testimony about whether either of them entered Baggett's home. Losik testified that he never entered Baggett's home, and never saw Rigan do so either. According to Losik, Rigan handcuffed Baggett and Losik took him to the squad car immediately after the gun fell. Losik never saw anyone go inside Baggett's home, nor would Baggett have had time to do so if events had unfolded as Losik described.

Yet Rigan testified that he grabbed Baggett by the arm immediately after the gun fell, and escorted Baggett inside so that Baggett could give his infant son to his daughter. Rigan also testified that while inside, he had a conversation with Baggett's daughter, and looked around the living room and front hallway for evidence of either bullet holes or spent cartridges. According to Rigan, he handcuffed Baggett inside the home, not on the front porch as Losik testified.

Neither Losik nor Rigan has offered any explanation for how Rigan could have entered Baggett's home, talked to his daughter, allowed Baggett to hand his child to his daughter, handcuffed Baggett, read Baggett his Miranda rights, and returned Baggett to the front porch, while Losik observed none of this. In the absence of any explanation, the court simply cannot accept the officers' descriptions of events as being truthful. This inconsistency alone would be enough to conclude that Sims' testimony must be credited over the officers'.

In addition to the officers' inconsistent testimony about entering Baggett's home, their testimony was inconsistent on other points. For instance, both officers describe a statement

4

Baggett made after the gun fell that he carried the gun because he lived in a dangerous neighborhood and that he meant no harm. Rigan testified that Baggett made the statement while still on the front porch. Losik, on the other hand, testified that Baggett did not make the statement until after he was handcuffed, placed in the squad car, and read his Miranda rights. The officers also told different stories about who read Baggett his Miranda rights—Losik testified that he did while in the squad car, while Rigan testified that he did while in Baggett's home.

Finally, the court focuses specifically on officer Losik's testimony, which the court finds implausible on two points. First, according to Losik, neither he nor Rigan searched, or even attempted to enter, Baggett's home. Given that the officers had just received a report of shots fired inside a home, and that they allegedly caught Baggett with a gun, it seems that a reasonable officer would have attempted to discern whether anyone in the home had been shot. That the officers made no such attempt strains common sense. Second, according to Losik, Rigan handcuffed Baggett immediately after the gun fell from Baggett's pant leg. His testimony does not account for what happened to the baby Baggett had been holding when the gun fell.

**Conclusion**

The court has carefully reviewed all of the parties' submissions, as well as the entire record in this case. It has also carefully listened to and observed each witness presented at the suppression hearing. During the course of the testimony, the court studied the witnesses' demeanor, listened to their tone and inflection, and observed their expressions. The court also reviewed transcripts of their testimony, compared their stories, and took into account the assertions set forth by Baggett in his affidavit. In addition, the court evaluated the reasonableness

5

of the witnesses' stories, any inconsistencies, and whether their description of events sounded plausible. Finally, the court kept in mind any motive the witnesses may have had to be less than truthful.

With all this in mind and after careful thought, the court concludes that the testimony of Sims was credible while the testimony of the officers was not. Accordingly, the court concludes that Baggett has met his burden of establishing that police found a gun in his home during an illegal search, without a warrant or consent. Because the government has failed to establish any exigent circumstances entitling officers to search Baggett's home, the gun they recovered is the fruit of an illegal search.

Therefore, for the reasons stated, Baggett's motion to suppress [11-1] is GRANTED.


ENTER:

DATE: March 24, 2006

_____
Blanche M. Manning
United States District Judge